# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**RONALD D. THOMPSON**
           **Plaintiff,**

    **v.**                            **Case No. 19-C-1273**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
           **Defendant.**

---

## DECISION AND ORDER

Plaintiff Ronald Thompson applied for social security disability benefits, claiming that he could no longer work due to a history of strokes, back pain, and anxiety. The Administrative Law Judge ("ALJ") assigned to the case denied the application, finding that plaintiff remained capable of light work involving simple, routine, repetitive tasks. In support of this conclusion, the ALJ noted that plaintiff fully recovered from his strokes, that a lumbar MRI revealed merely mild degenerative changes, that plaintiff received little in the way of mental health treatment, and that he continued working even after the alleged onset of disability.

Plaintiff now seeks judicial review of the ALJ's decision. He argues that the ALJ failed to account for his moderate limitations in concentration, persistence, and pace; failed to evaluate his physical abilities on a function-by-function basis; and failed to support the light work capacity finding with substantial evidence. Finding no reversible error, I affirm. I first set forth the applicable standards of review, before summarizing the evidence of record and then addressing plaintiff's arguments.

# I. STANDARDS OF REVIEW

## A.     Disability Standard

Agency regulations prescribe a five-step, sequential test for determining disability.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step one, the ALJ determines whether the claimant is engaging in "substantial gainful activity" ("SGA").  "Substantial work activity is work activity that involves doing significant physical or mental activities."  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work activity done "for pay or profit."  Id. § 404.1572(b).  Agency regulations set forth income guidelines for determining whether work constitutes SGA.  See 20 C.F.R. § 404.1574.[1]  If a claimant is engaged in SGA, he will be found not disabled regardless of his medical condition.  Id. § 404.1520(b).  However, the regulations generally consider work that the claimant was forced to stop or reduce to below SGA level after six months or less because of his impairments to be an "unsuccessful work attempt."  Id. § 404.1575(a)(2).[2]

If the claimant is not engaging in SGA, the ALJ determines at step two whether the claimant suffers from any "severe" impairments.  An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).

If the claimant has a severe impairment or impairments, step three requires the ALJ to determine whether any of those impairments, alone or in combination, qualify as conclusively

---

[1]For instance, the monthly SGA amount for 2020 is $1260.  In 2016, it was $1130. https://www.ssa.gov/oact/cola/sga.html.

[2]The regulations also permit a disabled claimant to engage in a "trial work period."  Id. § 404.592.  During a trial work period, a person receiving disability benefits may test his ability to work and still be considered disabled.  The agency does not consider services performed during the trial work period as showing that the disability has ended until services have been performed in at least 9 months in a 60-month period.  https://www.ssa.gov/oact/cola/twp.html.

disabling under the agency's "Listings."  Id. §§ 404.1520(d), 416.920(d).  To meet or equal a

Listing, "the claimant must satisfy all of the criteria of the listed impairment."  Maggard v. Apfel,

167 F.3d 376, 380 (7th Cir. 1999).  For instance, most mental impairment Listings require the

claimant to demonstrate at least two "marked" limitations or one "extreme" limitation under the

"paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting

with others; (3) concentrating, persisting, or maintaining pace ("CPP"); and (4) adapting or

managing oneself.  See, e.g., Swoverland v. Saul, No. 19-C-824, 2020 U.S. Dist. LEXIS 60926,

at *27 (E.D. Wis. Apr. 7, 2020).[3]

    If the impairment(s) do not meet or equal a Listing , the ALJ decides at step four whether

the claimant can, given his "residual functional capacity" ("RFC") perform his past relevant

work.  20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  RFC is an assessment of the

claimant's ability to do sustained work-related physical and mental activities in a work setting

on a regular and continuing basis.  A "regular and continuing basis" means eight hours a day,

for five days a week, or an equivalent work schedule.  SSR 96-8p, 1996 SSR LEXIS 5, at *1.

    If the claimant cannot perform past work, at step five the ALJ considers whether the

claimant can, given his age, education, work experience, and RFC, perform other jobs existing

in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).  "The

claimant bears the burden of proof at steps one through four, after which at step five the

burden shifts to the Commissioner."  Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

"The Commissioner typically uses a vocational expert ('VE') to assess whether there are a

_____

    [3]The agency recently modified these criteria.  Prior to January 2017, they were (1)
activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4)
episodes of decompensation.  Id. n.2.

3

significant number of jobs in the national economy that the claimant can do." Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009).

**B.    Judicial Review**

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the conclusion. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020). "Substantial evidence is not a demanding requirement." Martin v. Saul, 950 F.3d 369, 373 (7th Cir. 2020). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (internal quote marks omitted). The court reviews the entire record, but it does not replace the ALJ's judgment with its own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. Jeske, 955 F.3d at 587. Where substantial evidence supports the ALJ's disability determination, the court must affirm the decision even if reasonable minds could differ concerning whether the claimant is disabled. Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019). Finally, while the ALJ must in rendering his decision build a logical bridge from the evidence to his conclusion, he need not provide a complete written evaluation of every piece of testimony and evidence. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012).

## II. FACTS AND BACKGROUND

**A.    Medical Evidence**

On July 25, 2014, plaintiff went to the emergency room, reporting that while at work that morning he found that his right side was "falling asleep." (Tr. at 366.) When a supervisor spoke to him, he could not find the right words to respond. He was brought to the hospital by

4

a co-worker, and it was determined that he had experienced a stroke.  (Tr. at 360, 366, 380.)
By the time he spoke to the doctor, he had regained significant strength in his right arm and
leg.  (Tr. at 366, 381.)  He was started on Plavix and aspirin at that time.  He also had a
complete work-up, including an MRA of the head and an echocardiogram, which were normal.
(Tr at 360, 389, 392.)  He discharged on July 26, on Plavix and aspirin, to follow up with Dr.
Robert Jones, a neurologist.  (Tr. at 380-81.)

On August 8, 2014, plaintiff saw Dr. Jones, noting no weakness in the arm or leg.  "It is
described as resolved, feels fine now.  Activity limitations include none."  (Tr. at 453.)  On
exam, he appeared well developed, well nourished, in no acute distress.  (Tr. at 454.)  His
spine was non-tender, with full range of motion of the neck and extremities.  (Tr. at 454-55.)
Mental status exam was normal, with euthymic affect, fluent speech, attentive in conversation,
and normal memory and concentration.  Neurological exam was also normal, with 5/5 strength
throughout, normal tone, intact sensation, good alternating hand and foot movements, steady
station, and normal walking.  Dr. Jones assessed cerebral infarction, improved, continuing
Plavix and aspirin.  (Tr. at 455.)  They would consider stopping Plavix in one month.  (Tr. at
456.)

On October 29, 2014, plaintiff experienced a recurrent stroke.  (Tr. at 358, 360, 361.)
He reported that he had been doing well since the previous episode until he woke up that day
and noticed some right arm and leg weakness.  By the time he arrived in the ER, his symptoms
had improved.  (Tr. at 358, 360.)  An echocardiogram was normal (Tr. at 385), but an MRI of
the head revealed an acute left frontal and thalamic stroke, and he was admitted and put on
stroke protocol (Tr. at 358, 387).  Dr. Jones recommended keeping him on aspirin and Plavix.
By the time of discharge on October 30, he was "back to his baseline without any neurologic

5

deficit." (Tr. at 359.)

On November 2, 2014, plaintiff went to the ER complaining of anxiety and panic. He was provided a prescription for Xanax. (Tr. at 603.)

Plaintiff followed up with Dr. Jones on November 10, 2014, his only complaint that of tingling and burning in the feet and hands, which was subsiding some. He otherwise denied weakness, numbness, burning or shooting pain, speech disturbance, confusion, or memory trouble. (Tr. at 449.) On exam, his spine was non-tender, with full range of motion of the neck and the extremities. Mental status exam was normal, including euthymic affect, fluent speech, and normal memory and concentration. Neurological exam was also normal, including 5/5 strength throughout, intact sensation, good alternating hand and foot movements, steady station, and normal walking. (Tr. at 451.) Dr. Jones assessed cerebral infarction, improved with "[n]o significant residual clinical deficit." (Tr. at 451.) He continued Plavix and aspirin. (Tr. at 451.) Plaintiff had also been prescribed Xanax, to take as needed for anxiety. (Tr. at 452.)

On November 17, 2014, plaintiff went to the emergency room complaining of tingling in his feet. (Tr. at 352.) He had been compliant with taking Plavix and aspirin, ambulated without difficulty or falls, and denied loss of sensation, range of motion, or strength. (Tr. at 353.) Neurological exam was normal. (Tr. at 354.) Doctors diagnosed peripheral neuropathy, providing gabapentin and advising him to follow up with Dr. Jones. (Tr. at 352, 354.)

On December 29, 2014, plaintiff established primary care with Dr. Curtis Radford, reporting that he was feeling pretty good other than neuropathy in the legs, which was helped by gabapentin. (Tr. at 444.) On exam, he appeared well developed, in no acute distress, with normal full range of motion of all joints. (Tr. at 446-47.) For peripheral neuropathy, Dr. Radford continued plaintiff on gabapentin and B complex vitamins. (Tr. at 447.)

6

On January 9, 2015, plaintiff saw Dr. Jones for neuropathy in his extremities. He had been given gabapentin "and is better." (Tr. at 440.) He reported no new strokes and was back to usual activities. He did complain that his legs felt tired and his arms felt tense. He continued to take Plavix and aspirin. (Tr. at 440.) The usual tests for peripheral neuropathy had been essentially benign. (Tr. at 431, 440.) On exam, he appeared in no acute distress, alert and oriented. (Tr. at 441-42.) He had full range of motion of the neck and extremities. Mental status exam was normal, including euthymic affect, fluent speech, and normal memory and concentration. Neurological exam was also normal, including 5/5 strength throughout, normal tone, intact sensation, good alternating hand and foot movements, steady station, and normal walking. (Tr. at 422.) Dr. Jones noted some response to gabapentin, with more myofascial type strain symptoms in the arms and legs. (Tr. at 442.) He referred plaintiff for a physical therapy evaluation. (Tr. at 431, 443.)

On January 19, 2015, plaintiff saw Adam Geske, PT, on referral from Dr. Jones. Geske noted that plaintiff had several mild cerebral strokes on October 30, 2014, as well as one in July, complaining of paresthesia in his upper extremity and lower extremities since the most recent stroke. The symptoms had been getting worse, but gabapentin helped some. Geske completed an assessment and, based on plaintiff's reports of intermittent incontinence, referred plaintiff back to Dr. Jones for clearance to commence therapy and then transition to a home exercise program. (Tr. at 349.) Plaintiff did not return to therapy. (See Tr. at 62-63.)

On February 3, 2015, plaintiff saw Dr. Issam Al-Bitar regarding leg pain. (Tr. at 435.) Exam was essentially normal (Tr. at 437), and the doctor did not know the etiology of plaintiff's problems (Tr. at 438). He was to follow up with his primary doctor. (Tr. at 438.)

On February 5, 2015, plaintiff returned to Dr. Jones regarding his neuropathy. (Tr. at

7

430.)  On exam, he was well developed, well nourished, in no acute distress, alert and cooperative.  He had full range of motion of the extremities. Mental status and neurological exams were again normal.  (Tr. at 432.)  Dr. Jones ordered an MRI of the cervical and lumbar spines and continued medications.  (Tr. at 433.)

According to a February 27, 2015, MRI: "Only mild degenerative disk changes and disk bulging are present at the cervical and lumbar levels with no significant compression on the thecal sac and no significant foraminal narrowing in either region."  (Tr. at 383.)

On April 7, 2015, plaintiff saw Dr. Radford for an annual physical.  Reviewing his history, Dr. Radford noted that plaintiff had a stroke in July 2014 and was started on Plavix and aspirin at that time.  He had a complete work-up, including MRA of the head and neck and an echocardiogram, which were negative.  He experienced another event in late October 2014, but subsequent testing was also normal.  His most pressing problem at that time was bronchitis.  (Tr. at 412.)  On review of systems, he denied fatigue, weakness, malaise, or weight gain/loss.  (Tr. at 414.)  He did complain of back pain and stiffness, and numbness/tingling. However, he denied difficulty with concentration, poor balance, inability to speak, or other neurological symptoms.  He also denied anxiety, mental problems, and depression.  (Tr. at 415.) On exam, he appeared well developed, well nourished, in no acute distress (Tr. at 416), with normal posture and gait, no obvious focal deficits, and normal mood and affect (Tr. at 417). Dr. Radford provided medication for bronchitis, with his other conditions to be maintained on aspirin, gabapentin, and Plavix.  (Tr. at 418.)

On June 2, 2015, plaintiff was seen in the ER for back pain.  He was not using over-the-counter medications for treatment of his symptoms.  (Tr. at 401, 409.) On exam, he displayed some tenderness and reduced range of motion, but straight leg raising was negative.  Doctors

8

diagnosed lumbago and cervicalgia, providing Hydrocodone. (Tr. at 401, 410.)

On July 20, 2015, plaintiff was seen in the ER for neck pain, which was thought related to overuse at work. He was not taking over the counter medications for his symptoms. On exam, he had paracervical tenderness with moderately reduced neck range of motion. (Tr. at 401, 407.) No paresthesias down the arms were elicited during the exam. He was given a trial of cyclobenzaprine. (Tr. at 401, 408.)

On July 22, 2015, plaintiff returned to Dr. Jones regarding peripheral neuropathy and cervicalgia, reporting that his pain was not any better. (Tr. at 401.) On exam, he appeared well developed, well nourished, in no acute distress. (Tr. at 403.) He displayed diffuse tenderness of the cervical and lumbar spine, but with full range of motion of the neck and extremities, normal mental status exam, and normal neurological exam. (Tr. at 403-04.) Dr. Jones found that plaintiff had "functionally recovered" from the strokes and approved discontinuation of Plavix. (Tr. at 404.) Regarding back and neck pain, Dr. Jones continued aspirin and cyclobenzaprine, further indicating plaintiff may benefit from chiropractic treatment or massage therapy, including myofascial release and posture management. (Tr. at 405-06.) Regarding the cervicalgia, Dr. Jones noted "fibromyalgia-like" symptoms. (Tr. at 405.)

Plaintiff received chiropractic treatment from August 2015 to November 2015 (Tr. at 508-33), and again from June 2017 to November 2017 (Tr. at 534-70). Notes from the first period generally indicate that plaintiff reported some improvement in his symptoms. (Tr. at 465, 467, 469, 524, 526, 530.) He reported more noticeable lumbar and cervical pain on October 29, 2015, after helping his uncle move. (Tr. at 528.) Notes from the second period also generally indicate that the symptoms improved or lessened with treatment. (Tr. at 539, 541, 545, 549, 551, 555, 557, 559, 563.) He reported more pain at an August 8, 2017 visit, which he attributed

9

to more activity as work (Tr. at 553), and more soreness in his low back on September 1, 2017, which he attributed to lifting a mattress (Tr. at 561). At his last visit on November 10, 2017, he reported intermittent stiffness but denied any severe episodes of pain. (Tr. at 569.)

On November 2, 2015, plaintiff saw Dr. Radford, complaining of joint pain over the last three weeks. (Tr. at 476.) On exam, he displayed full range of motion of all joints. (Tr. at 478.) Dr. Radford diagnosed cervical and lumbar myofascial pain syndrome, for which he was taking aspirin and Tramadol. (Tr. at 478-79.) Dr. Radford recommended massage therapy or chiropractic; he indicated it was best not to use narcotics for this pain. He also recommended exercise and light weight lifting. (Tr. at 480.)

In December 2015, plaintiff started seeing Dr. Albert Fisher as his primary physician. (Tr. at 598.) On May 31, 2016, Dr. Fisher filled out a return to work form indicating plaintiff should be off work from May 31 to June 2, 2016, due to urticaria (hives). (Tr. at 498.)

On September 11, 2017, plaintiff went to the ER complaining of blurred vision. He noted that the symptoms lasted five seconds and then resolved. (Tr. at 599.) Neurological exam was normal (Tr. at 600), and doctors found his symptoms, exam, and testing did not support a stroke diagnosis (Tr. at 601).

On September 14, 2017, plaintiff was seen at Optivision, noting that his vision was lost for five to ten seconds, then came back to normal. He reported that he still got some occasional blurs. (Tr. at 584.) He was diagnosed with a branch retinal artery occlusion ("BRAO"). (Tr. at 583.) He underwent an ultrasound on September 26, which revealed a small, likely benign thyroid nodule. It was recommended he have a follow up ultrasound in 12 months to ensure stability. (Tr. at 581.) On September 27, plaintiff returned to Optivision, reporting that he could see, complaining only of dry eye. (Tr. at 617.) A November 1 notes indicates

10

"BRAO OD resolved." (Tr. at 620.) He was to return as needed. (Tr. at 620.)

On October 9, 2017, plaintiff sought mental health treatment through Winnebago County (Tr. at 637), complaining of panic attacks (Tr. at 638). He denied any previous mental health treatment. On mental status exam, he appeared casual, with clean hygiene, no motor or speech issues, anxious mood and affect, logical thought content, clear thought process, fair intellect, poor insight and judgment, and intact memory. He was scheduled for a psychiatric evaluation and counseling. (Tr. at 638.)

On October 10, 2017, plaintiff was seen for the psychiatric evaluation, complaining of anxiety/panic disorder. He stated he experienced anxiety since childhood, which had gotten better as he got older, but increased again after his strokes. He denied ongoing depressive symptoms. (Tr. at 633.) On mental status exam, he appeared alert and cooperative, with normal hygiene and attire. He was oriented times three, with neutral mood, anxious/euthymic affect, normal speech, coherent and logical thought content. Regarding concentration, he was able to reverse digits up to 3 in a row, and regarding memory, he was able to remember 3/3 objects immediately, 2/3 after five minutes, and able to recall long term memory correctly. Insight was fair and intellect average. The provider diagnosed generalized anxiety disorder and panic disorder, starting him in sertraline (Zoloft). (Tr. at 634.)

On November 13, 2017, plaintiff returned for medication review. He appeared alert and cooperative, with normal hygiene and attire. He was oriented times three, with neutral mood, euthymic affect, normal speech, coherent and logical thought content; intellect was average and insight fair. He reported that his current medication "is controlling his anxiety. . . . Still has some anxiety but much improved with medication." (Tr. at 632.) The provider increased sertraline and recommended adding therapy. (Tr. at 632.)

11

On November 14, 2017, plaintiff commenced mental health therapy. He reported that since his strokes, his panic had become worse. He also reported physical pain that is distracting. Plaintiff and the counselor focused on stress and anxiety management, and he reported he was happy to be taking Zoloft. (Tr. at 631.)

**B.    Procedural History**

**1.    Plaintiff's Application and Reports**

Plaintiff applied for benefits in August 2015, alleging that he had been disabled since March 24, 2012 (Tr. at 252, 258, 297), due to degenerative disc disease, strokes, paresthesia, incontinence, depression, anxiety, back pain, memory troubles, and learning disabilities (Tr. at 301). He reported that he stood 5'8" tall and weighed 224 pounds. (Tr. at 301.)

In a function report, plaintiff wrote that he experienced severe back pain, lower extremity weakness and numbness, right leg pain, and numbness in his arms. He indicated that he had two strokes in the past in which caused speech and memory issues. (Tr. at 308.) Regarding his activities, he indicated that he prepared his own meals (using a microwave), did his laundry at the Laundromat every three weeks, went out daily using public transportation, and shopped in stores. (Tr. at 310-11.) He further indicated that he could handle money. (Tr. at 311.) He denied any hobbies, interests, or social activities. (Tr. at 312.) He reported that his impairments affected every function listed on the form except hearing and seeing. He indicated that he could walk less than a block, sit for 10-15 minutes before experiencing pain, stand for 10-15 minutes, and that lifting a gallon of milk caused pain in his neck, back, and shoulders. (Tr. at 313.) He reported that he did not follow instructions or handle stress and changes in routine well. (Tr. at 313-14.) In a physical activities addendum, plaintiff wrote that he could

12

continuously sit for 10-15 minutes, stand 10-15 minutes, and walk less than one block, and in a day sit two to three hours, stand about two hours, and walk about one to two hours. He noted no lifting limitation on this form. (Tr. at 316.)

## 2. Consultative Exams

In addition to collecting his medical records, the agency obtained plaintiff's earnings records, which revealed that he earned $6527 in 2003, $5899 in 2004, $19,661 in 2005, $16,343 in 2006, $7338 in 2007, $7229 in 2008, $6842 in 2009, $2614 in 2010, $11,532 in 2011, $3900 in 2012, $2500 in 2013, $8177 in 2014, $1863 in 2015, and $9532 in 2016. (Tr. at 283.) The agency also sent plaintiff for physical and mental consultative examinations.

### a. Dr. Jankus

On November 12, 2015, plaintiff was examined by Ward Jankus, M.D. Plaintiff complained of intermittent burning sensation in the arms and legs. He had tried gabapentin, but it did not help. He also reported having an MRI, but the report was not available to Dr. Jankus. (Tr. at 484.) He further reported that his back had bothered him for many years. He indicated the pain would come on if he did too much heavy lifting, more than 15-20 pounds. He estimated a walking tolerance of 30 minutes to an hour. He indicated that he did a lot of walking in the community because he did not have a car. He estimated a standing tolerance of 20 minutes and sitting tolerance of 15 minutes. He indicated that, in an eight-hour period, he was on his feet three or four hours. He could use his hands for self-care. (Tr. at 485.)

On exam, plaintiff had normal mental status to conversation with no difficulty following directions or instructions. Back exam revealed normal alignment, no particular tenderness, and no lumbar spasm. Neck range of motion was full. (Tr. at 485.) Upper and lower extremities

13

also had full range of motion. Reflexes seemed "brisk." There was slightly positive Hoffman of both hands. He had average tone and bulk, 5/5 strength in the arms and legs, and intact sensation. Gait pattern seemed smooth and tandem gait normal. Romberg was borderline, with a moderate amount of sway, but no complete loss of balance. Fine finger movements were normal, and he could use the hands without difficulty to manipulate his socks, footwear, paperwork and jacket, without fine motor issues appreciated. (Tr. at 486.)

Dr. Jankus's impressions were (1) intermittent upper and lower extremity numbness/burning sensation, with mild hyperreflexia on current neurologic exam; and (2) intermittent, activity-dependent mechanical lower back pain, with currently well-preserved range of motion. His biggest problem seemed to be his neurologic complaints. Dr. Jankus did not believe this was neuropathy. (Tr. at 486.) He also did not think the symptoms, which were bilateral, were related to his previous strokes. He suspected there may be some cervical cord irritation, although he did not have the MRI report. Due to the possible cervical cord issue, Dr. Jankus opined that plaintiff should avoid unprotected heights and ladders, as well as slippery and uneven ground. Dr. Jankus concluded:

> It sounds like walking and standing are reasonably well tolerated. He can walk in the range of 30 minutes to an hour and he actually has to do a fair amount of walking because he does not have a motor vehicle. Currently out of an 8-hour span he estimates he might be on his feet in the range of three to four of those and maybe something in the range of four hours give or take an hour is what he can get away with if he can break it up somewhat.
>
> The hands seem to work okay today for grasping and manipulating and it sounds like he is able to do his own self-care.

(Tr. at 487.)

### b. Dr. Krawiec

On December 1, 2015, plaintiff underwent a psychological evaluation with Steve

Krawiec, Ph.D.  He came to the appointment alone, and his speech was well-organized, understandable, and goal directed.  His affect was appropriate, and there was nothing remarkable about his gait or station.  (Tr. at 490.)

When asked why he had applied for benefits, plaintiff responded, "Physical disabilities." (Tr. at 490.)  He reported two strokes last year and had burning and numbness in his extremities.  He indicated one doctor said he had neuropathy, another fibromyalgia.  He further indicated that he sometimes slurred his words, sometimes had difficulty with focus, and had trouble with memory.  He saw a chiropractor for his back.  (Tr. at 490.)

Plaintiff reported that he lived with his mother.  He said he was able to do all the household chores and handled activities of daily living adequately.  As for hobbies, he said he was a reader.  He got along with others pretty well.  (Tr. at 491.)

On mental status exam, plaintiff was oriented although one day off on the date.  His performance on a proverb task was fair to adequate.  He described his mood as irritable, related to pain.  (Tr. at 491.)  He also reported anxiety about having another stroke.  (Tr. at 492.)

Dr. Krawiec administered the WAIS-IV (Wechsler Adult Intelligence Scale), which indicated "some mild cognitive impairment."  His poorest relative performance was on working memory, which involves complex attention and concentration.  (Tr. at 492.)  Dr. Krawiec also administered the WMS-III (Wechsler Memory Scale), which indicated some impairment in some areas, generally of a mild severity.  (Tr. at 493.)

Dr. Krawiec diagnosed mild vascular neurocognitive disorder and unspecified depressive disorder, concluding:

I do not think this man would have difficulty understanding simple job

instructions. His cognitive difficulty conceivably could interfere with him carrying them out. [T]hat could relate to an ability to persist at tasks and maintain adequate pace. I think that if his work involved simple, [redundant] tasks he might be able to be successful.

This individual also spoke of having some mood difficulty which involves, it seemed, primarily irritability and some loss of enjoyment with things in life. I will diagnose Unspecified Depressive Disorder. I would not see that condition as something that would necessarily significantly interfere with his ability to be successful in the workplace. I do not think that he necessarily would have trouble getting along with coworkers, supervisors and peers.

Workplace changes and stressors would be inadvisable. His chances for success probably would be enhanced absent such things.

(Tr. at 494.)

### 3. Agency Decisions

The agency denied the application initially on January 19, 2016, based on the reviews of Ronald Shaw, M.D., and Richard Hamersma, Ph.D. (Tr. at 127-28, 165, 170.) Regarding his physical limitations, Dr. Shaw found plaintiff capable of light work (lifting 20 pounds occasionally and 10 pounds frequently, standing/walking about six hours in an eight-hour workday, and sitting about six hours in an eight-hour workday), avoiding all exposure to hazards. (Tr. at 107.) Dr. Shaw noted that plaintiff recovered well from his strokes, with no significant residual effects. The RFC assessment took into account plaintiff's ongoing complaints of back and neck pain (with mild DDD on imaging) and neurological issues (numbness/burning in arms and legs). Dr. Shaw further noted Dr. Jankus's exam findings showing subtle hyperreflexia, slightly positive Hoffman sign, and mildly impaired position sense, but 5/5 motor strength, normal range of motion, good hand use, normal sensation, and normal gait. (Tr. at 108.)

Dr. Hamersma evaluated plaintiff's mental impairments under Listings 12.02 (organic

16

mental disorders) and 12.04 (affective disorders), finding mild restriction of activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. at 104-05.) In evaluating mental RFC, Dr. Harmersma found plaintiff not significantly limited in his ability to remember work-like procedures and understand/remember short and simple instructions, but moderately limited in his ability to understand/remember detailed instructions (Tr. at 108); not significantly limited in his ability to carry out short and simple instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others, and make simple work related decisions, but moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruptions from psychologically based symptoms; and not significantly limited in his ability to be aware of hazards, travel in unfamiliar places, and set realistic goals, but moderately limited in the ability to respond to changes in the work setting. (Tr. at 109.) Dr. Hamersma concluded that plaintiff was "mentally capable of sustaining simple unskilled work." (Tr. at 110.)

Plaintiff requested reconsideration (Tr. at 174), but on June 30, 2016, the agency maintained the denial (Tr. at 159-60, 177, 183, 188, 194) based on the reviews of Meghana Karande, M.D., and Lisa Fitzpatrick, Psy.D., who agreed with the previous agency assessments (Tr. at 135-41). Explaining her conclusions in narrative form, Dr. Fitzpatrick indicated: "Claimant able to understand/remember simple instructions. Unable to consistently remember/understand moderately to highly complex/detailed instructions." (Tr. at 139, 154.) "Able to maintain attention for two hours at a time and persist at simple tasks over eight- and forty-hour periods with normal supervision; symptoms would preclude persistence at more

17

complex tasks over time." (Tr. at 140, 155.) "Able to tolerate simple changes in routine, avoid hazards, travel independently, and make/carry out simple plans." (Tr. at 140, 155.)

Plaintiff then requested a hearing before an ALJ. (Tr. at 199.)

**4.     Hearing**

On December 27, 2017, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also summoned a VE to provide testimony on jobs plaintiff might be able to do. (Tr. at 35.)

In an opening statement, plaintiff's counsel stressed the residual effects of plaintiff's strokes. (Tr. at 41-42.) The ALJ asked why plaintiff alleged an onset date in 2012 when the strokes occurred in 2014, and counsel indicated he would amend the alleged onset date to 2014. (Tr. at 43.) Counsel and the ALJ also discussed the SGA issue, with counsel acknowledging that plaintiff made $5000 in the third quarter of 2016 but arguing that this was a trial work period. (Tr. at 43.) The ALJ later pointed out that plaintiff's wages reached SGA level for about seven months in 2016. (Tr. at 50-51.) The ALJ stated that he would not consider this an unsuccessful work attempt because it was greater than six months. (Tr. at 51-52.) However, he indicated that counsel could contend it was a trial work period and file a post-hearing brief making that argument. (Tr. at 52-54.) Counsel could also address the amended onset date in the brief. (Tr. at 59-60.)

**a.     Plaintiff**

Plaintiff testified that he was 44 years old and lived with his mother. (Tr. at 44.) He had an HSED, with some college. (Tr. at 49.) He stood 5'8" tall and weighed 223 pounds. (Tr. at 45.) Since March 2017, he had worked part-time as a janitor at a bank, five days per week,

18

three to four hours per day, for a total of 15-20 hours per week.  (Tr. at 45-46, 54.)  In that job, he vacuumed, removed trash, dusted, mopped, and re-stocked bathrooms.  (Tr. at 46.)  He indicated that he rotated tasks with his co-workers and split his duties into two shifts: 11:00 a.m. to 12:00 p.m. and 4:00 p.m. to 6:00 p.m.  He lived 10 blocks from the bank, walking or taking the bus to get there.  (Tr. at 47.)  He indicated that he did not have a car and did a lot of walking to get around.  (Tr. at 48.)  He testified that he was struggling in this job, which he had gotten through the Department of Vocational Rehabilitation ("DVR"), missing work.  (Tr. at 58.)

Prior to his employment as a janitor, plaintiff worked as a security guard for about seven months in 2016, checking credentials of those entering the premises.  (Tr. at 50, 54-56.)  He was fired from that job for leaving his post during a panic attack, which he had experienced since he was a kid.  (Tr. at 56-57.)  He had also been written up for making mistakes and missing work.  (Tr. at 57.)  In 2005 and 2006, he worked at a bacon plant for Patrick Cudahy, first on the assembly line and then as a janitor.  (Tr. at 58-59.)

The ALJ asked plaintiff to identify the conditions he alleged to be disabling, and plaintiff first mentioned his back issues.  (Tr. at 59.)  He testified that he attempted full-time work through temporary services but could not complete those jobs.  The ALJ then asked for the number one medical condition that prevented plaintiff from working, and plaintiff indicated the strokes.  (Tr. at 60.)  His first stroke was in July/August 2014.  He indicated the strokes were disabling because "they're reoccurring and my chances of getting another one are higher than, say, somebody else, you know, off the streets.  They don't know what caused them."  (Tr. at 61.)  For treatment, he was put on blood thinners.  (Tr. at 61.)  He was also sent to physical therapy, but he only went once.  (Tr. at 62-63.)  He received no other treatment for the

19

residuals of the strokes. He testified that he experienced weakness in his legs, greater on the right (Tr. at 63), which caused him to limp (Tr. at 64-65). Asked to elaborate on how the strokes affected his ability to work, plaintiff testified that, in addition to fear he would have another one, he experienced weakness in the right side of his body (Tr. at 65, 80), which made it hard for him to push the cart he used for work (Tr. at 65). He said that picking up even a coffee cup hurt. He was not sure if this was due to fibromyalgia, which he had also been told he had, or nerve damage. He did not have weakness in his left arm but did have a "buzzing sensation in it and it hurts, too." (Tr. at 66.)

Plaintiff further testified that he recently had vision troubles after a TIA in his eye.[4] He used to have 20/20 vision, but it was now 20/25. He also had pain behind the eye and light sensitivity. (Tr. at 82.) He was supposed to return in six months for recheck. (Tr. at 83.)

Plaintiff indicated that he was diagnosed with fibromyalgia in 2015, but he could not recall how that was tested. (Tr. at 67.) He took gabapentin, which made the pain tolerable. (Tr. at 68.) The doctors also told him to exercise, which he did by walking. He indicated that he walked about four or five hours a day, including his three hours at work. (Tr. at 69.) He had lost 13 or 14 pounds over the past few months. (Tr. at 74-75.) He also tried to stay active doing things around the house, e.g. dishes and cleaning, but he could not "do a workout like a regular person." (Tr. at 75.) He also testified that he did not clean often due to pain. (Tr. at 81.) He did laundry at the Laundromat, which also caused more pain. (Tr. at 81.) The pain made him more irritable and angry. (Tr. at 82.)

---

[4]A transient ischaemic attack ("TIA") is the same as a stroke, except that the symptoms last for a short amount of time. Symptoms can include sudden blurred vision or loss of sight. https://www.stroke.org.uk/sites/default/files/transient_ischaemic_attack.pdf.

Plaintiff next mentioned a bulging disc in his back, shown on imaging in 2015.  His doctors had not proposed any treatment for his back.  (Tr. at 70.)  He testified that he experienced back pain "all the time."  (Tr. at 81.)

The ALJ asked plaintiff about anxiety and how it affected his ability to work, and plaintiff testified, "I want to run from the job, literally take off and run."  (Tr. at 71.)  He indicated that he was first diagnosed with anxiety in 1985 or '86, and he had held jobs since then requiring interaction with other people.  (Tr. at 71.)  He recently started on Zoloft for his anxiety, which helped.  (Tr. at 72.)  He had also recently started therapy through the county.  (Tr. at 72-73.)

Plaintiff testified that, other than working, he did not do much.  He took a nap between work shifts (Tr. at 76) and played video games in his room (Tr. at 77).  He also liked to read.  (Tr. at 79.)

At the end of his testimony, plaintiff stated that if he felt he could work full-time, he would.  "I love money.  I love it and I've been doing that all of my life and I know I can't."  (Tr. at 83.)  On re-examination, the ALJ questioned plaintiff about this statement, noting that according to his work history plaintiff had only two years where he made more than $15,000; most years he made around $7000.  (Tr. at 84.)  Plaintiff responded that he was making pretty good money at Patrick Cudahy, but he quit that job.  (Tr. at 84.)  Reviewing his earnings, the ALJ pressed plaintiff to explain why, prior to the alleged onset of disability, he did not work more.  Plaintiff responded that he "was probably laid off" during those years.  (Tr. at 86.)

### b. VE

The VE classified plaintiff's past work as meat packager and cleaner, both unskilled, medium jobs, and security guard, a semi-skilled, light job.  (Tr. at 87-88.)  The ALJ then asked a series of hypothetical questions, assuming a person of plaintiff's age, education, and work

21

experience. (Tr. at 89.) The first question assumed a person capable of light work, who could never climb ladders, ropes, or scaffolds, and never work at unprotected heights or around moving mechanical parts. Mentally, the person was limited to performing simple, routine, and repetitive tasks, not at a production rate pace (for example, not assembly line work), and limited to making simple work-related decisions, with occasional changes in a routine work setting. (Tr. at 89-90.) The VE testified that this person could not perform plaintiff's past work but could do other jobs, such as hand packager, laundry folder, and electronics worker. (Tr. at 91.) The second question added a limitation of frequent interaction with supervisors and occasional interaction with co-workers and the general public; the VE testified that her answer would not change. (Tr. at 92.) Finally, if the person were off task greater than 10% of the time or regularly missed more than two days per month, all work would be precluded. (Tr. at 93.)

Plaintiff's counsel asked the VE about the impact of a sit/stand option, and the VE testified that if the person needed to shift positions at will that would be work-preclusive, but changing positions at 30-minute intervals would not. (Tr. at 93-94.) If the person were limited to occasional handling and fingering with the dominant upper extremity, that would eliminate the identified jobs. (Tr. at 94.) Adding this manipulative limitation to the restrictions posited in the first hypothetical, the person could work as a counter clerk. (Tr. at 95.)

In a January 11, 2018, post-hearing brief, plaintiff's counsel amended the alleged onset date to July 26, 2014, corresponding to the first stroke. Regarding the SGA issue, counsel argued without elaboration that the wages paid in the third quarter of 2016 should be considered a trial work period. (Tr. at 348.)

### 5. ALJ's Decision

On June 6, 2018, the ALJ issued an unfavorable decision. (Tr. at 16.) Following the

five-step process (Tr. at 20), the ALJ found at step one that plaintiff had worked since July 26, 2014, the amended alleged onset date, and that his wages during part of 2016 rose to the level of substantial gainful activity (Tr. at 21). While plaintiff argued post-hearing that the work performed in third quarter was a trial work period, the brief failed to analyze the issue and specify how plaintiff's work activity constitutes a trial work period. (Tr. at 21.) Nevertheless, despite the work at the SGA level in 2016, the ALJ continued with the evaluation process. (Tr. at 22.)

At step two, the ALJ found that plaintiff had several severe impairments, including a history of multiple strokes, degenerative disc disease ("DDD"), obesity, and anxiety. (Tr. at 22.) At step three, the ALJ found that none of these impairments met or equaled a Listing. The ALJ specifically evaluated plaintiff's mental impairments under Listing 12.02 (neurocognitive disorders) and 12.06 (anxiety disorders). (Tr. at 22.)

The ALJ noted that plaintiff alleged anxiety, irritability, and anger that affected his ability to get along with and interact with others. He further alleged panic attacks, confusion, memory issues, slurred speech, and learning difficulties, which made it difficult to retain information, read, play games, and interact appropriately with others. The ALJ found it reasonable to assume that plaintiff would have moderate functional limitations that interfered with his capacity to perform basic work activity. However, the ALJ found that the evidence did not support greater functional limitations. (Tr. at 22.)

The ALJ found mild limitation in understanding, remembering, or applying information. Plaintiff underwent a consultative examination with Dr. Krawiec in December 2015, with testing reflecting a mild vascular neurocognitive disorder. However, the ALJ noted that these deficits had not caused disabling limitations. Throughout the longitudinal medical evidence, plaintiff

23

demonstrated no difficulty in understanding and communicating effectively with providers. Further, during the November 2015 consultative exam with Dr. Jankus, plaintiff was able to specifically detail his health history, and Dr. Jankus noted he was able to follow directions and instructions. (Tr. at 22.)

The ALJ found no limitation in interacting with others. Plaintiff admitted that he was able to interact socially in order to go out alone, shop in stores, and use public transportation. He attended the exam with Dr. Krawiec unaccompanied and was noted to speak in a well-organized, understandable, and goal-directed manner. Further, Dr. Krawiec indicated that plaintiff would likely not have difficulty interacting with others. (Tr. at 23.)

With regard to concentrating, persisting, or maintaining pace, the ALJ found moderate limitation. During Dr. Krawiec's exam, plaintiff complained of significant anxiety secondary to recurring strokes. Considering his diagnoses of anxiety and cognitive impairment, the ALJ found it reasonable to conclude that plaintiff would have some limitations in CPP. Dr. Krawiec noted that plaintiff's test scores revealed relative weakness in working memory, which involves complex attention and concentration. Therefore, the RFC limited plaintiff to simple, routine, and repetitive tasks. The ALJ found plaintiff capable of performing simple tasks as he retained the ability to prepare simple meals on a daily basis, launder his clothes at the Laundromat every three weeks, and use public transportation. Additionally, he was able to handle money and described himself to Dr. Krawiec as a reader. (Tr. at 23.)

Finally, the ALJ found no limitation in adapting or managing oneself. Plaintiff reported that he could tend to personal care, and he presented to medical appointments with appropriate hygiene and grooming. He also informed Dr. Jankus that he had no difficulty with self-care, bathing, dressing, feeding, or grooming. In the function report, he noted he was

24

limited only by physical pain. In regards to his ability to adapt, plaintiff had not received significant mental health treatment despite a diagnosis with anxiety in 2014. The longitudinal mental status exams were within normal limits, with plaintiff noted to be cooperative with a normal mood and affect, and normal behavior. (Tr. at 23.)

The ALJ further noted that the agency psychological consultants, Drs. Hamersma and Fitzpatrick, completed reports under the old paragraph B criteria, finding that plaintiff had mild limitations in daily activities, no limitations in social functioning, moderate limitations in CPP, and no episodes of decompensation. The ALJ gave significant weight to these assessments, finding them consistent with the record as a whole. Plaintiff was initially diagnosed with anxiety in 2014, but he failed to engage in therapy until October 2017 and in the interim he worked at the SGA level in 2016 and continued to work as a janitor in 2017. (Tr. at 23.)

The ALJ noted that the paragraph B criteria do not constitute an RFC assessment but are used to rate the severity of mental impairments at steps two and three. The mental RFC evaluation required a more detailed assessment. (Tr. at 24.)

The ALJ then determined that plaintiff had the RFC to perform light work, except that he could never climb ladders, ropes, and scaffolds, and never work at unprotected heights or around moving mechanical parts. With regard to understanding, remembering, and carrying out instructions, he could perform simple, routine, repetitive tasks but not at production rate pace, such as assembly line work. With regard to the use of judgment in the workplace, he could make simple work-related decisions. He could interact appropriately with supervisors on a frequent basis and with co-workers and the public on an occasional basis. Finally, he could tolerate occasional changes in a routine work setting. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 24.)

25

In considering the symptoms, the ALJ first acknowledged the two-step process set forth in the regulations, under which he first had to determine whether there was an underlying medically determinable impairment that could reasonably be expected to produce the alleged symptoms. Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limited his functioning. For this purpose, if the statements were not substantiated by objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 24.)

Plaintiff alleged that he was disabled and unable to sustain regular work activity secondary to the residuals of strokes, DDD, and anxiety/depression. He complained of symptoms including severe neck and back pain, and lower extremity numbness and weakness, which restricted him to walking less than a block, sitting 10-15 minutes, and standing 10-15 minutes, and rendered him unable to lift a gallon of milk without pain exacerbation. At the hearing, he testified to bilateral weakness, greater on the right due to a history of strokes, numbness and tingling in the bilateral upper extremities that caused pain with use, fibromyalgia pain as of 2015, and back pain secondary bulging discs. (Tr. at 24.)

The ALJ then stated:

After careful consideration of the evidence, the undersigned finds that [plaintiff's] medically determinable impairments could reasonably be expected to produce the above alleged symptoms. However, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. at 25.)

The medical evidence confirmed a stroke in July 2014, with a negative work-up. He was

26

placed on a medication regimen of Plavix and aspirin. He did well, demonstrating no residual limitations until October 29, 2014, when he began to experience right side weakness and was again hospitalized with another stroke per MRI. He again underwent a negative work-up, improved, and was released the next day with the same medication regimen. On November 10, 2015, plaintiff was found to have functionally recovered from the strokes and Plavix was terminated. The follow-up physical exams were consistent with a full recovery, revealing no musculoskeletal deformity, no extremity deformity, no right side weakness or pronator drift, full range of motion of the extremities, 5/5 strength, normal gait, and steady station. Accordingly, the evidence did not support disabling residuals of the strokes. Further, plaintiff returned to the workforce after his strokes, working at the SGA level in 2016. (Tr. at 25.)

Plaintiff underwent a consultative exam with Dr. Jankus in November 2015 and admitted to recovering reasonably well from the strokes. However, he complained of ongoing post-stroke burning sensation in the upper and lower extremities and longstanding back pain. Contrary to his allegations, he informed Dr. Jankus that he could lift 15-20 pounds, sit 15 minutes, stand 20 minutes, and walk 30 minutes to an hour, admitting that he walked a lot because he did not have a car; he indicated that in an eight-hour period he was on his feet three to four hours. On exam, he had normal gait, normal back alignment, and good back range of motion. He also had normal cervical spine range of motion, normal upper and lower extremity range of motion, average tone and bulk, 5/5 strength throughout, normal sensation, normal cranial nerve examination, and the ability to use the bilateral hands to manipulate his socks, footwear, paperwork, and jacket, without fine motor issues. Dr. Jankus assessed plaintiff with intermittent upper and lower extremity numbness and burning with mild hyperflexia and intermittent activity-dependent mechanical low back pain, not associated with neuropathy

27

or residuals of the strokes. Dr. Jankus opined that plaintiff could tolerate walking and standing reasonably well and had no limitations related to the bilateral hands. The ALJ gave great weight to the assessment, as it was consistent with the examination findings. (Tr. at 25.) The ALJ further noted that in February 2015 plaintiff reported that the medication gabapentin was effective in pain relief related to numbness and tingling. (Tr. at 25-26.)

The record included a February 2015 lumbar spine MRI that revealed only mild degenerative changes. On exam, he maintained normal gait, with no obvious focal deficits. The medication Tramadol was prescribed, and plaintiff underwent several courses of physical therapy. (Tr. at 26.)

The ALJ noted that while the testing reflected merely mild DDD, he considered the effect of obesity on plaintiff's pain perception and mobility when assessing RFC. The record showed that plaintiff stood 5'8" tall and weighed 224 pounds, producing a body mass index ("BMI") of 34.1, considered level I obesity under the regulations. However, plaintiff reported that his obesity did not prevent him from standing three to four hours a day and walking up to an hour at a time. (Tr. at 26.)

The record also referenced other medical problems. For instance, plaintiff experienced a brief episode of five to ten second vision loss and occasional episodes of blurred vision in September 2017, which resolved on their own. A work-up revealed 20/20 bilateral visual acuity, and the record contained no specific treatment recommendations, as plaintiff admitted that he immediately returned to his baseline vision. The record also referenced a fibromyalgia diagnosis, but it was not substantiated as a medically determinable impairment under the criteria in SSR 12-2p. (Tr. at 26.)

The ALJ next noted that, despite his impairments, plaintiff worked at the SGA level in

2016 and reported in September 2017 that he was "doing well" overall and working as a janitor. (Tr. at 26.) "Accordingly, considering [plaintiff] recovered without residuals from two strokes, has merely mild DDD, and appears unaffected significantly by obesity, the undersigned finds the evidence to support restricting [plaintiff] to work at the light exertional level with the identified postural and environmental restrictions." (Tr. at 26.)

In regards to plaintiff's anxiety, the evidence reflected an initial diagnosis in November 2014 when he sought emergency care for right side numbness that resolved. He reported the recent onset of significant anxiety and was prescribed a short course of Xanax. He received no further mental health treatment prior to the December 2015 consultative exam with Dr. Krawiec, wherein he was diagnosed with a mild neurocognitive disorder and unspecified depressive disorder. Dr. Krawiec opined that plaintiff could follow simple job instructions and get along with interacting appropriately with others, but would have difficulty adapting to workplace changes and stress. The ALJ gave substantial weight to the assessment that plaintiff was restricted to simple work and few workplace changes based on his cognitive impairment and history of anxiety. "However, considering [plaintiff's] history of anxiety, the undersigned restricts his interaction with others to frequent with supervisors and occasional with others." (Tr. at 27.) Regarding the diagnosis of unspecific depression, the ALJ assessed it as a non-severe impairment as the evidence did not reflect significant associated functional limitations. The evidence did not indicate significant complaints, and there had been no treatment for depression. Additionally, the longitudinal mental status exams indicated plaintiff was cooperative with normal mood, affect, and behavior. (Tr. at 27.)

Plaintiff finally sought treatment for increasing anxiety and panic attacks in October 2017 when he presented as anxious and was diagnosed with generalized anxiety disorder, with

29

individual psychotherapy and medication recommended. On mental status exam, he initially appeared anxious but with treatment was observed to have a euthymic effect. The remainder of the examinations indicated that plaintiff was cooperative with normal speech, goal-directed, logical, coherent thoughts, and no suicidal ideation. (Tr. at 27.)

As for the opinion evidence, the ALJ gave great weight to the reports of the agency medical consultants, Drs. Shaw and Karande, finding plaintiff capable of light work with environmental restrictions. The ALJ found these assessments consistent with the record as a whole, plaintiff's capacity to work at the SGA level, and the consulting examiner's report. (Tr. at 27.)

The ALJ noted that Dr. Fisher opined on May 31, 2016, that plaintiff was unable to work from May 31, 2016, through June 2, 2016, secondary to hives. The ALJ gave this assessment little weight, as it was for a temporary period and occurred while plaintiff was working at the SGA level. (Tr. at 27.)

The ALJ concluded:

In sum, the above residual functional capacity assessment is supported by the substantial weight of the evidence. [Plaintiff] worked at the substantial gainful activity level. [Plaintiff] fully recovered from two stroke[s]. [Plaintiff] failed to follow-up with mental health therapy until October 2017. [Plaintiff] did not experience any exacerbations that required emergency treatment or hospitalization despite the lack of treatment.

(Tr. at 27.)

At step four, the ALJ determined that plaintiff could not perform any past relevant work (Tr. at 28), but found at step five that he could perform other jobs, as identified by the VE, including hand packager, laundry folder, and electronics worker (Tr. at 28-29). The ALJ accordingly found plaintiff not disabled. (Tr. at 29.)

Plaintiff requested review by the Appeals Council (Tr. at 247-51), but on May 9, 2019, the Council denied his request (Tr. at 1). I therefore review the ALJ's decision as the final decision from the Commissioner on plaintiff's application. See Prater v. Saul, 947 F.3d 479, 481 (7th Cir. 2020).

## III. DISCUSSION

### A. CPP

Plaintiff first argues that the ALJ failed to properly account for his moderate CPP limitations in the hypothetical questions and the RFC. (Pl.'s Br. at 11.) The argument is a common one and, under the Seventh Circuit's Stewart/O'Connor-Spinner line of cases, frequently results in remand. See, e.g., Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019); Winsted v. Berryhill, 923 F.3d 472, 476-77 (7th Cir. 2019); DeCamp v. Berryhill, 916 F.3d 671, 675-76 (7th Cir. 2019); Moreno v. Berryhill, 882 F.3d 722, 730 (7th Cir. 2018), amended on reh'g, 2018 U.S. App. LEXIS 9296 (7th Cir. Apr. 13, 2018); Varga v. Colvin, 794 F.3d 809, 813 (7th Cir. 2015); O'Connor-Spinner v. Astrue, 627 F.3d 614, 619-220 (7th Cir. 2010); Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009).

A bit of background first: As indicated above, at steps two and three of the sequential evaluation process, the ALJ determines whether the claimant suffers from severe medically determinable impairments and, if so, whether any of those impairments qualify as presumptively disabling under the Listings. For mental impairments, severity is evaluated primarily under the paragraph B criteria, which are cataloged above. If at step two the ALJ rates the degree of limitation as "none" or "mild," he will generally conclude that the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1). If the impairment is deemed severe, the ALJ will

31

then determine at step three if it meets or is equivalent in severity to a listed mental disorder. Id. § 404.1520a(d)(2). As also indicated above, most mental Listings are met if he claimant has one "extreme" limitation or two "marked" limitations. If the mental impairment is severe but neither meets nor is equivalent in severity to any Listing, e.g., if the limitations are "moderate," the ALJ must then assess mental residual functional capacity. Id. § 404.1520a(d)(3). The mental RFC assessment used at steps four and five requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B. SSR 96-8p, 1996 SSR LEXIS 5, at *13.

At steps four and five, ALJs do not ordinarily phrase mental restrictions in terms of a "moderate" or "marked" limitation. Rather, they usually "attempt to translate such a limitation into job-related restrictions that a VE is likely to understand." Hoeppner v. Berryhill, 399 F. Supp. 3d 771, 778 (E.D. Wis. 2019). For instance, ALJs often limit the claimant to "unskilled work" or work involving "simple, repetitive tasks." In O'Connor-Spinner, the Seventh Circuit held that a such a limitation "will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace," explaining that the "ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." 627 F.3d at 620.

While O'Connor-Spinner indicated that the ALJ need not use the specific words "concentration, persistence and pace" in all cases, id. at 619, the Seventh Circuit has since reversed in a number of cases involving more detailed formulations, e.g., "simple, routine, repetitive tasks with few workplace changes," Crump, 932 F.3d at 569-70; "routine work" involving "simple work instructions," "simple work place judgments," and "no more than occasional changes in the work setting," Moreno, 882 F.3d at 730; and work "free of fast paced

32

production requirements, involving only simple work related decisions with few if any work place [sic] changes and no more than occasional interaction with coworkers or supervisors," <u>Varga</u>, 794 F.3d at 815; <u>see also</u> <u>DeCamp</u>, 916 F.3d at 675-76 ("eliminating jobs with strict production quotas or a fast pace").

Nevertheless, the Seventh Circuit continues to stress that the "law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work. . . . What we do require—and our recent precedent makes plain—is that the ALJ must account for the totality of a claimant's limitations in determining the proper RFC." <u>Martin</u>, 950 F.3d at 374 (internal citations and quote marks omitted).

In <u>Martin</u>, for instance, "the ALJ tailored Martin's RFC to her CPP limitations without assuming that restricting her to unskilled work would account for her mental health impairments."  <u>Id.</u>

> Start with concentration. The . . . ALJ found that "[Martin] could maintain the concentration required to perform simple tasks, remember simple work-like procedures, and make simple work-related decisions." Moving to persistence, the ALJ, in defining and tailoring the RFC, further determined that Martin could stay on-task and thereby "meet production requirements." Of course, even if someone is on-task, it is still possible she may operate at such a slow pace that an employer would not find her work satisfactory. Hence, the second "P"—pace—must enter the equation. The ALJ incorporated pace-related limitations by stating that Martin needed flexibility and work requirements that were goal-oriented. Ideally, the ALJ would have brought to the surface what is surely implicit in the determination—that any pace-based goals must be reasonable as a way of signaling that the employer could not set the bar beyond the person's functional reach. We take comfort here from the fact that the jobs the vocational expert suggested inherently reflected such a reasonableness limitation. Although Martin complains that the pace requirements are too vague, there is only so much specificity possible in crafting an RFC. The law required no more.

<u>Id.</u>; <u>see also</u> <u>Chojnacki v. Saul</u>, No. 19-cv-432-wmc, 2020 U.S. Dist. LEXIS 66955, at *10 (W.D. Wis. Apr. 16, 2020) (noting that "the ALJ in <u>Martin</u> 'showed her work' and addressed all three

33

components of CPP in the RFC assessment").

The court has also affirmed, despite the use of otherwise disfavored terminology, when the CPP limitations are context or task specific, and the RFC restricts the claimant from those scenarios. See, e.g., Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019) (affirming where the claimant's "impairments surface only when he is with other people or in a crowd," and the RFC "limited interactions with others"); Pytlewski v. Saul, 791 Fed. Appx. 611, 616 (7th Cir. 2019) ("Although we often reject the idea that a hypothetical confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace, such a hypothetical may be adequate when it restricts a claimant with stress-or panic-related limitations, as is the case here, given Pytlewski's recurring anxiety, to low-stress work.") (internal citation and quote marks omitted); O'Connor-Spinner, 627 F.3d at 619 ("We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform.").

The court has further held that in some cases "an ALJ may reasonably rely upon the opinion of a medical expert who translates [CPP] findings into an RFC determination." Burmester, 920 F.3d at 511; see also Morrison v. Saul, No. 19-2028, 2020 U.S. App. LEXIS 7441, at *12 (7th Cir. Mar. 10, 2020) (finding no error where ALJ limited claimant to "simple and detailed, one-to-five step instructions" drawing this restriction from the opinion of the medical expert, "which is a permissible way of 'translating' medical evidence into work-related restrictions"); Baldwin v. Berryhill, 746 Fed. Appx. 580, 584 (7th Cir. 2018) (finding no error where ALJ relied on psychologist's explanation in the narrative assessment of his report that

34

the claimant had the concentration and pace "necessary to fulfill a normal workday"); but cf. DeCamp, 916 F.3d at 676 ("But even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms.").

Finally, the court has held that in some cases a CPP error may be harmless, particularly where the claimant fails to describe the additional limitations the ALJ should have included. See Jozefyk, 923 F.3d at 498; see also Kuykendoll v. Saul, 801 Fed. Appx. 433, 438 (7th Cir. 2020) ("Notably, Kuykendoll posits no relevant limitations in concentration, persistence, or pace that the ALJ should have included in his RFC assessment."); Saunders v. Saul, 777 Fed. Appx. 821, 825 (7th Cir. 2019) ("Saunders never once has told this court what other restrictions the ALJ should have included in her hypothetical, nor even at oral argument could he suggest a better way to capture the idea behind limitations in concentration, persistence, and pace and apply those problems to job requirements."); Dudley v. Berryhill, 773 Fed. Appx. 838, 842 (7th Cir. 2019) ("Critically, Dudley did not identify any limitations that the ALJ omitted and should have included in the hypothetical question.").

Accordingly, there is no rule of automatic reversal whenever an ALJ fails to include the magic words in the hypothetical and the RFC. On that understanding, I turn to plaintiff's challenge.

Plaintiff notes that the ALJ found a moderate CPP limitation, which he then accommodated in the RFC by limiting plaintiff to "simple, routine, repetitive tasks" "not at production rate pace, such as assembly line work." (Pl.'s Br. at 12 & n.2, citing Tr. at 24.) Plaintiff argues this is insufficient under Crump, 932 F.3d at 570 ("[T]the ALJ generally may not

35

rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace.") and Varga, 794 F.3d at 815 (finding that limitation to work "free of fast paced production requirements" failed to account for all of Varga's difficulties maintaining concentration, persistence, and pace). (Pl.'s Br. at 12.)  Plaintiff also seeks to preemptively distinguish Jozefyk, arguing that his CPP limitations are present even when he is alone, and Burmester, stating that the ALJ did not cite the reports of the agency psychological consultants in determining RFC (Pl.'s Br. at 13, citing Tr. at 27); in any event, plaintiff contends, the consultants also endorsed CPP limitations, as did Dr. Krawiec (Pl.'s Br. at 13-14).

Plaintiff overlooks much of the ALJ's analysis of this issue.  Earlier in his decision, in discussing CPP, the ALJ noted that according to Dr. Krawiec's testing plaintiff displayed relative weakness in working memory, which involves complex attention and concentration. "Therefore, the residual functional capacity limits [plaintiff] to simple, routine, repetitive tasks."  (Tr. at 23.) The ALJ further found that plaintiff was capable of performing simple tasks given his activities, including preparing simple meals, laundering his clothes, using public transportation, handling money, and reading.  (Tr. at 23.)  The ALJ also gave significant weight to the opinions of the agency psychological consultants, who found moderate limitations in CPP yet still concluded that plaintiff could perform simple, unskilled work.  (Tr. at 23, citing Tr. at 113-26, 144-58.)  As discussed above, Dr. Fitzpatrick provided a narrative discussion explaining that plaintiff could handle simple tasks over a forty-hour period, but his symptoms would preclude persistence at more complex tasks over time.  (Tr. at 155.)  The ALJ found these opinions consistent with the record as a whole, including plaintiff's work at the SGA level in 2016 and continued work as a janitor in 2017.  (Tr. at 23.)  The ALJ did not repeat this analysis in discussing RFC later in his

36

decision, but he did not have to. See Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("We do not discount it simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant.").

In that later RFC discussion, the ALJ noted that despite an initial diagnosis of anxiety in November 2014 plaintiff received no further treatment until October 2017. The ALJ further noted that during the December 2015 consultative exam, Dr. Krawiec opined that plaintiff could follow simple job instructions and get along with others, but would have difficulty adapting to workplace changes and stress. The ALJ gave substantial weight to the assessment that plaintiff was restricted to simple work and few workplace changes but, giving some credence to plaintiff's history of anxiety, further limited him to frequent interaction with supervisors and occasional interaction with others. Finally, the ALJ noted that longitudinal mental status exams indicated plaintiff was cooperative with normal mood, affect, and behavior. After he sought treatment in October 2017, the exams continued to reflect normal speech, goal-directed, logical, coherent thoughts, and no suicidal ideation. (Tr. at 27.)

In sum, this is not a case in which the ALJ merely assumed, without meaningfully engaging with the evidence, that an RFC for simple work would accommodate plaintiff's CPP restrictions. The ALJ thoughtfully explained the bases for his conclusions, tying those conclusions to the findings of the experts. See Martin, 950 F.3d at 374.

The ALJ also honed in on the specific nature of plaintiff's CPP problem. As plaintiff acknowledges in reply, the most probative evidence on this point came from Dr. Krawiec, whose exam revealed a mild cognitive impairment with very poor working memory. (Pl.'s Rep. Br. at 4, citing Tr. at 491-93.) The ALJ recognized that working memory involves complex attention and concentration (Tr. at 23, 492), explaining that in order to account for plaintiff's

37

deficiency in this area the RFC limited plaintiff to simple, routine, repetitive tasks (Tr. at 23). The Seventh Circuit recently affirmed under similar circumstances, stating:

> Crump teaches that a restriction to simple tasks is "generally" not enough to account for moderate CPP limitations. Id. ("[W]e have likewise underscored that the ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." (quotation marks omitted)). The concern is that the restriction is used as a one-size-fits-all solution without delving into an individualized assessment of the claimant's specific symptoms. See Martin, 950 F.3d at 373–74. But here we do not have a general assumption that people who have moderate difficulties focusing and keeping up will be able to do so when the task is easy—we have a specific finding that Bruno [the claimant] struggles to concentrate only when the assignment at hand is a complex one.

> The ALJ explained that she limited Bruno to simple tasks specifically because of "evidence of decreased concentration, when handling more complex tasks, as evidenced by past poor performance on long tests and testimony that he was unable to keep a job due to being unable to pass an entrance test." The ALJ also noted that Bruno's testimony of math limitations and his diagnosis of borderline intellectual functioning "appeared to primarily relate to his difficulties with more complex tasks as noted by his school," but there was "no evidence that he was unable to maintain focus at his present job" in the bakery.

> The ALJ found Bruno to have moderate CPP limitations, a conclusion consistent with the evidence, and accounted for them by restricting him to simple tasks based on a specific finding that his CPP struggles arise during complex undertakings. That approach contains no reversible error.

Bruno v. Saul, No. 19-3196, 2020 WL 3497633, at *3 (7th Cir. June 26, 2020). In the present case, the ALJ relied on Dr. Krawiec's testing, which indicated that plaintiff would have trouble maintaining concentration and persisting in complex tasks, as well as plaintiff's mental ability to sustain his work as a janitor.

Plaintiff criticizes the ALJ's evaluation of Dr. Krawiec's report, but his arguments are off base. Plaintiff first overstates the report, claiming that Dr. Krawiec found plaintiff's "functional deficits from his strokes would likely interfere with him carrying out simple instructions, which would effect his ability to persist at tasks and maintain adequate pace." (Pl.'s Br. at 13, Pl.'s

38

Rep. Br. at 4, emphasis in original, citing Tr. at 494.)  In reply, plaintiff states that Dr. Krawiec

found him "unable to understand simple job instructions, resulting in limitations in 'carrying out

simple instructions,' which limited his 'ability to persist at tasks and maintain adequate pace.'"

(Pl.'s Rep. Br. at 6, citing Tr. at 494.)  Dr. Krawiec actually said:

> I do not think this man would have difficulty understanding simple job
> instructions. His cognitive difficulty conceivably could interfere with him carrying
> them out. [T]hat could relate to an ability to persist at tasks and maintain
> adequate pace. I think that if his work involved simple, [redundant] tasks he might
> be able to be successful.

(Tr. at 494, emphasis added.)  The ALJ limited plaintiff to simple, repetitive tasks, as the doctor

suggested.

In a footnote, plaintiff also faults the ALJ for giving weight to parts of Dr. Krawiec's

opinion but not others.  (Pl.'s Br. at 13 n.3, citing Denton v. Astrue, 596 F.3d 419, 425 (7th Cir.

2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply

cherry-pick facts that support a finding of non-disability while ignoring evidence that points to

a disability finding.").)  But there is a difference between cherry picking evidence and weighing

it.  Medical reports often contain several different opinions, which the ALJ should evaluate

separately.  See Tenhove v. Colvin, 927 F. Supp. 2d 557, 572 (E.D. Wis. 2013).  The ALJ need

not apply an all-or-nothing approach, see Stephens v. Colvin, No. 14-cv-3117, 2016 U.S. Dist.

LEXIS 41944, at *30 (N.D. Ill. Mar. 29, 2016) ("[A]n ALJ is not required to credit every part of

a medical opinion just because he credits one part."), aff'd, 671 Fed. Appx. 390 (7th Cir. 2016);

see also Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007) (stating that "the ALJ is not

required to rely entirely on a particular physician's opinion"), and need only explain the basis

for his conclusions, which the ALJ did here.  Plaintiff accuses the ALJ of rejecting the portion

of Dr. Krawiec's opinion finding that he would have difficulty adapting to workplace changes

and stress (Pl.'s Br. at 13 n.3), but the ALJ stated: "Substantial weight is assigned to the assessment that [plaintiff] is restricted to simple work and few workplace changes based on his cognitive impairment and history of anxiety." (Tr. at 27.) To the extent the ALJ discounted part of Dr. Krawiec's report, it was to find plaintiff <u>more</u> limited, restricting his interactions with supervisors, co-workers, and the public. (Tr. at 27.)

Finally, plaintiff fails to identify any work-related limitations that the ALJ should have included in the RFC to account for his moderate difficulties of CPP. <u>See</u> <u>Jozefyk</u>, 923 F.3d at 498 ("It is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none."). As the Commissioner notes, this is unsurprising, given the consistently normal mental status exam findings, the medical opinions, the dearth of mental health treatment, and plaintiff's continued ability to work. (Def.'s Br. at 20.)

There is no reversible error in the ALJ's handling of the CPP issue in this case.

## B.    Function-by-Function Assessment

Plaintiff next argues that the ALJ failed to assess his abilities on a function-by-function basis. (Pl.'s Br. at 14, citing SSR 96-8p.) After plaintiff filed his main brief, the Seventh Circuit joined its sister circuits "in concluding that a decision lacking a seven-part function-by-function written account of the claimant's exertional capacity does not necessarily require remand." <u>Jeske</u>, 955 F.3d at 596 (citing <u>Mascio v. Colvin</u>, 780 F.3d 632, 635-36 (4th Cir. 2015); <u>Hendron v. Colvin</u>, 767 F.3d 951, 956-57 (10th Cir. 2014); <u>Cichocki v. Astrue</u>, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam); <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005); <u>Depover v. Barnhart</u>, 349 F.3d 563, 567-68 (8th Cir. 2003)). The <u>Jeske</u> court explained:

In the end, so long as the ALJ's discussion shows that the ALJ considered all

40

strength-demand functional limitations in arriving at a conclusion supported by substantial evidence, we need not remand for clearer explanation. Cf. Depover, 349 F.3d at 568. To be sure, remand may be appropriate when—despite evidence of a functional limitation—the ALJ fails to assess a claimant's ability to perform that function. Cf. Mascio, 780 F.3d at 636; Cichocki, 729 F.3d at 177-78. But Jeske has not shown that to be the case here.

Id.

In reply, plaintiff argues that Jeske was wrongly decided (Pl.'s Rep. Br. at 6), but as a district judge in the Seventh Circuit I am required to follow it. Plaintiff spends several pages criticizing Jeske's legal conclusion (Pl.'s Rep. Br. at 6-11), but he makes no attempt to distinguish the case on its facts. Nor does he argue that the ALJ failed to provide the required narrative explanation for the RFC. Cf. Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1036 (E.D. Wis. 2004) (citing SSR 96-8p). There is accordingly no basis for remand on this argument.

## C. RFC

Finally, plaintiff argues that the ALJ erred in finding that he retained the RFC for full-time light work. (Pl.'s Br. at 17.) Plaintiff notes that light work requires a person to be on his feet six out of eight hours, yet he consistently reported that his symptoms limited him to standing for 10-15 minutes and waking less than a block at one time, and standing for about two hours and walking for about one to two hours in a normal eight-hour period. (Pl.'s Br. at 17-18, Pl.'s Rep. Br. at 11-12.)

An ALJ is not required to include in the RFC every limitation the claimant alleges, only those he "accepts as credible." Schmidt, 496 F.3d at 846. Here, the ALJ acknowledged plaintiff's allegations regarding his limited ability to stand and walk (Tr. at 24), but he found those allegations inconsistent with the evidence of record, including plaintiff's functional recovery from the strokes, exams showing full strength and normal gait (Tr. at 25), the MRI

41

showing "merely mild degenerative changes," and his continued employment, as a janitor in 2017 and other work at the SGA level in 2016 (Tr. at 26). Plaintiff does not even attempt to demonstrate that the ALJ's conclusion was "patently wrong." See Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017) ("We give the ALJ's credibility finding 'special deference' and will overturn it only if it is 'patently wrong.'") (quoting Eichstadt v. Astrue, 534 F.3d 663, 667-68 (7th Cir. 2008)).

Plaintiff acknowledges that at the hearing he admitted working part-time as a janitor, but he notes that this work was broken down into two segments: a one hour shift and a two to three hour shift, where he could nap between shifts. (Pl.'s Br. at 18.) The Seventh Circuit has noted that even part-time work may cut against a claim of total disability, Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008), and the standing and walking required of plaintiff's janitor position, even broken up, appears to exceed his alleged limitation. Plaintiff further admitted that he sometimes walked the 10 blocks to work, and that he did a lot of walking to get around because he did not have a car, also inconsistent with this allegations. (Tr. at 25, 47-48, 485.) Finally, plaintiff has no response for his work at SGA level in 2016.[5]

Plaintiff next argues that the ALJ failed to build an accurate and logical bridge from the evidence to the finding that he could stand and walk up to six hours per day, on a regular and continuing basis. (Pl.'s Br. at 18, Pl.'s Rep. Br. at 12.) Much like his CPP argument, however, he never engages with the ALJ's actual analysis. As indicated above, the ALJ thoroughly

_____

[5]As plaintiff notes in reply, "even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." (Pl.'s Rep. Br. at 3, quoting Shauger v. Astrue, 675 F.3d 690, 697 (7th Cir. 2012).) The ALJ did not cite plaintiff's work as definitive proof that he was not disabled but rather as one piece of evidence supporting his conclusion.

reviewed the medical evidence, which showed that plaintiff functionally recovered from the strokes and demonstrated full strength and normal gait during numerous exams.[6] The ALJ also relied on plaintiff's continued employment and his statements to Dr. Jankus regarding the extent of his walking, which were inconsistent with his allegations. (Tr. at 25-26.) Finally, the ALJ credited the reports of the agency medical consultants, who concluded that plaintiff could work at the light level. (Tr. at 27.)

Plaintiff challenges the ALJ's reliance on the agency consultants, but the basis for his argument is unclear. (Pl.'s Br. at 18.) Plaintiff indicates that the consultants' assessment was based on the results of Dr. Jankus's consultative exam, which in turn was based on what plaintiff told Dr. Jankus, which was consistent with plaintiff's reported part-time work at the time of the hearing. (Pl.'s Br. at 18-19, Pl.'s Rep. Br. at 12-13.) The ALJ summarized plaintiff's statements to Dr. Jankus regarding what he could do, noting their inconsistency with the allegations in plaintiff's function report. He then gave great weight to Dr. Jankus's conclusion that plaintiff could tolerate standing and walking reasonably well and had no limitation related

---

[6]In reply, plaintiff faults the ALJ and the Commissioner for failing to address the type of "objective" medical evidence of physical limitations one would expect from two strokes. (Pl.'s Rep. Br. at 1.) But plaintiff cites no such record evidence himself, so it is unclear how the ALJ erred in this regard. As the ALJ noted, plaintiff's own providers concluded that he "functionally recovered" from the strokes (Tr. at 25, 404), and Dr. Jankus opined that plaintiff's symptoms "were not associated with neuropathy or residuals of his strokes" (Tr. at 25, 487). Plaintiff also faults the ALJ and the Commissioner for relying on objective findings such as full range of motion, normal gait, and no significant abnormalities on imaging, which would not address functional deficiencies from strokes. (Pl.'s Rep. Br. at 1-2.) As indicated, the record does not support plaintiff's claim of significant residual effects from the strokes. Moreover, while plaintiff now focuses on the alleged residuals from his strokes, before the agency he also alleged disability based on degenerative disc disease and obesity, so it was entirely appropriate for the ALJ to address this evidence. It was also appropriate for the Commissioner to discuss the evidence about plaintiff's ability to walk, as plaintiff's RFC argument in the main brief was based on his alleged inability to remain on his feet as required for light work.

43

to his bilateral hands.  (Tr. at 25.)  Plaintiff develops no argument that the ALJ erred in evaluating Dr. Jankus's report.

Plaintiff also fails to explain why it was improper for the agency doctors to rely on the consultative exam; nor does he explain why it was improper for Dr. Jankus to take his statements into account.  In any event, the agency doctors also relied on a review of the medical evidence.  Finally, plaintiff presented no medical opinion positing greater limitations than the ALJ found.[7]  See Dudley, 773 Fed. Appx. at 843 ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."); Best v. Berryhill, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("There is no error when there is no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.") (internal quote marks omitted); Sienkiewicz v. Barnhart, 409 F.3d 798, 803 (7th Cir. 2005) ("But as the ALJ observed, both of the consulting physicians who reviewed Sienkiewicz's records opined that she could meet the requirements of light work by sitting for six hours in an eight-hour day, and no doctor ever suggested that any greater limitation was required."); Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004) ("More importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.").  In sum, plaintiff fails to establish that it was error to credit the agency consultants' opinions.  See Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation.").

---

[7]As the ALJ noted, treating physician Dr. Fisher excused plaintiff from work for a few days due to a case of the hives, but he imposed no permanent restrictions.  (Tr. at 27.)  Plaintiff alleges a Chenery violation in the Commissioner's discussion of Dr. Fisher's opinion (Pl.'s Rep. Br. at 2), but the ALJ discussed this report in his written decision.  See Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011) ("We limit our review to the reasons articulated by the ALJ in the written decision.") (citing SEC v. Chenery, 318 U.S. 80, 93-94 (1943)).

44

Plaintiff next cites Murphy v. Colvin (Pl.'s Br. at 19, Pl.'s Rep. Br. at 13), where the court concluded that:

> the ALJ failed to build the accurate and logical bridge from the evidence to her conclusion so that, we as a reviewing court, could assess the validity of her ultimate findings and afford Murphy meaningful judicial review. The ALJ's RFC determination is inadequate because it is not supported by substantial evidence, such as a doctor's functional assessment, or Dr. Mayer's notes and Murphy was not discredited to the point where the ALJ could not rely on her testimony. Based on these facts, the RFC assessment does not take into account Murphy's asserted inability to lift no more than twenty pounds at a time, carry objects weighing up to ten pounds, or stand or walk for six hours of an eight-hour workday.

759 F.3d 811, 819 (7th Cir. 2014) (internal citation omitted). As discussed above, in the present case the ALJ relied on the agency medical consultants, both of whom found that plaintiff could sustain full-time light work, as well as the results of Dr. Jankus's exam. The ALJ also explained why he could not accept plaintiff's allegations, noting their inconsistency with the objective medical evidence, the exam findings, his statements to Dr. Jankus, and his continued employment after the alleged onset date, including work at the SGA level.

Finally, plaintiff contends that the ALJ's decision completely fails to acknowledge or assess the substantial physical therapy records.[8] (Pl.'s Br. at 19, Pl.'s Rep. Br. at 13.) That is incorrect. The ALJ acknowledged that plaintiff underwent several courses of therapy, citing the chiropractic treatment notes. (Tr. at 26, citing Ex. 9F.) He was not required to quote from each of them. See Kolar v. Berryhill, 695 Fed. Appx. 161, 161 (7th Cir. 2017) ("ALJs need not comment on every line of every physician's treatment notes[.]"); see also Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010) ("The ALJ need not, however, discuss every piece of evidence

_____

[8]Plaintiff refers to physical therapy records, but as he admitted at the hearing he went to physical therapy just once. (Tr. at 62-63; see also Tr. at 349.) In making this argument, plaintiff relies on the notes of his chiropractic treatment.

45

in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability.").  Plaintiff generally notes that, after months of chiropractic treatment, his cervical and lumbar impairments had not substantially improved.  (Pl.'s Br. at 20, Pl.'s Rep. Br. at 13.)  However, plaintiff points to no specific evidence within those records requiring greater limitations.  Any error in failing to discuss these records in more detail was harmless.[9]  See Primm v. Saul, 789 Fed. Appx. 539, 545 (7th Cir. 2019) (finding failure to mention certain evidence harmless); McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011) (same).

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of June, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge

---

[9]As indicated above, plaintiff generally reported improvement with chiropractic treatment, with a few setbacks after he exerted himself helping his uncle move and lifted a mattress.  (See also Def.'s Br. at 6, discussing these notes.)  In reply, plaintiff alleges a Chenery violation (Pl.'s Rep. Br. at 2), but as I have noted in previous cases, ALJs are not required to discuss every piece of evidence in the record but need only sufficiently articulate their assessment of the evidence to assure the court that they considered the important evidence and to enable the court to trace the path of their reasoning.  A social security claimant cannot, consistent with this rule, accuse an ALJ of skipping medical records, then raise Chenery as a bar to any consideration by the Commissioner or the court of the significance of those records.  Anderson v. Colvin, No. 13-C-0788, 2014 U.S. Dist. LEXIS 151646, at *88 (E.D. Wis. Oct. 25, 2014).